UNITED STATES of America, Plaintiff,

v.

James COLLINS, Defendant.

No. 94 Cr. 106 (KMW).

United States District Court, S.D. New York.

Sept. 16, 1994.

---

Jeremy H. Temkin, Asst. U.S. Atty., Mary Jo White, U.S. Atty., New York City, for plaintiff.

Viktor V. Pohorelsky, Gold & Wachtel, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Defendant James Collins is charged with knowingly possessing a firearm in interstate commerce after having been convicted previously of a crime punishable by imprisonment for a term exceeding one year. He moves to suppress all evidence concerning the gun seized from him on the ground that the search violated his Fourth Amendment rights. A suppression hearing was held on July 7, 1994, and the parties submitted both pre- and post-hearing memoranda. For the reasons set forth below, the court grants the defendant's motion to suppress.

## I. BACKGROUND

Testimony at the July 7, 1994 suppression hearing revealed the following uncontroverted facts. On February 14, 1994 four agents of the Drug Enforcement Administration ("DEA") went to the Milford Plaza Hotel ("hotel") based on information obtained from the DEA's Bogota, Columbia office regarding the suspected drug activity of Delio Mosquera ("Mosquera"), reportedly a guest in the hotel. Upon their arrival, the DEA agents were assisted in locating Mosquera's room by Eduardo Santiago ("Santiago"), the hotel's security officer. When the DEA agents identified themselves at Mosquera's door, Mosquera consented to a search of the room, where the agents discovered approximately 750 grams of heroin. Mosquera was then arrested.

Shortly after the arrest, the telephone in the hotel room rang. Mosquera told the DEA agents that the caller was likely to be his New York heroin connection, and DEA Agent Rafael Reyes ("Reyes"), posing as Mosquera, answered the telephone, and made arrangements to meet with the unidentified female caller in order to complete the drug transaction. The woman informed Agent Reyes that she was currently with another person in an automobile that could not be left unattended, but that she could meet him in front of the hotel in twenty minutes.

Rather than follow that plan, the woman knocked on the door of the room in which Mosquera and the DEA agents were located, approximately ten to fifteen minutes after the telephone call. Agent Reyes admitted the woman, later identified as Carmen Giraldo ("Giraldo"). After she instructed him to accompany her to a second, undisclosed location to exchange the money for the heroin, he placed her under arrest. Because of the woman's earlier reference on the telephone to a car, Agent Brian Connelly ("Connelly") went downstairs after her arrest to look for

the car that had brought her to the hotel. After observing nothing unusual, Agent Connelly returned to the room upstairs.

At roughly this same time, Santiago observed a car double-parked in front of the hotel. At the suppression hearing, Santiago testified that he was suspicious of the car because he had approached it twice to verify that its occupants were, in fact, waiting for someone inside the hotel, and on each occasion the car drove around the block in an evasive manner. Santiago testified, and the DEA agents confirmed, that when the DEA agents came downstairs after the arrests in the hotel room, Santiago promptly reported to them that he had observed a car outside the hotel that he had concluded was suspicious. Santiago did not tell these agents the factual basis for his conclusion. Rather, Santiago simply reported that a suspicious car was parked outside, and the agents thereafter prepared to search that car.

(The "suspicious" car was, in fact, wholly unconnected to the drug transaction that had recently unfolded inside the hotel. Instead, the car was a livery cab that contained the driver in the front seat, and the defendant and his five year old nephew in the back; the cab driver had been instructed to remain parked outside of the hotel while the defendant's sister-in-law attempted to secure accommodations for her family for the evening. At the suppression hearing, the cab driver and the defendant contradicted Santiago's claim that the cab had twice driven around the block; both testified that the cab had remained stationary for the entire time that the defendant's sister-in-law was inside the hotel.)

After escorting defendants Mosquera and Giraldo to a government vehicle, Agents Reyes and Connelly, along with two New York City Police Department officers who had been dispatched to the hotel to assist the DEA agents with their search of the car, approached the livery cab in which the defendant was waiting, and knocked on the windows. The driver, Ramon Perez ("Perez"), was instructed to surrender his keys, and to exit the automobile. (Transcript of the Suppression Hearing of July 7, 1994 ("Tr.") at 112, 163).

There is a dispute as to what occurred next.[1] The court does not need to resolve that dispute however, because the *Terry* stop itself was made without the reasonable basis required by law.

## II. DISCUSSION

The defendant contends that the seizure violated his Fourth Amendment rights because it ran afoul of the guidelines enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny governing so-called investigatory stops. The court agrees.

*Terry* held that even a limited investigatory stop by law enforcement officers implicates the Fourth Amendment because such a stop clearly constitutes a seizure. *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877. However the Court also held that so long as the investigating officer has "a reasonable suspicion sup-

---

1. The livery cab had tinted windows. Agent Reyes testified that Agent Connelly opened the door from the outside at precisely the same moment that the defendant opened it from the inside (Tr. at 13), whereas Agent Connelly testified that he opened the door on his own, after observing the defendant in the back seat. (Tr. at 163–64). Both agents testified that as soon as the rear door was opened, they began questioning the defendant about what he was doing outside the hotel. (Tr. at 17–18, 164). In response to this questioning, the defendant responded that he was waiting for his wife, who was getting a room inside. *Id.*

The defendant testified, however, that the agents did not question him immediately after opening his car door, but, rather, began by ordering him to step out of the car, stating that they were conducting a "legal search" of the car, and asked the defendant to display his hands.

(Tr. at 134). The defendant testified that at that point he attempted to conceal under the seat the gun he was carrying for protection in his sister-in-law's neighborhood, from which he had just come. (Tr. at 148). Santiago's testimony tends to confirm the defendant's statement that he was asked to step out of the car before the questioning began, and before the agents saw the gun. Santiago testified that he observed the entire encounter between the defendant and the agents, and that as soon as the car doors were opened, he heard Agent Reyes ask the defendant to step out of the car, and then, seconds later, heard the agents yelling "gun." (Tr. at 91–3).

The defendant and the agents agree, however, that at some point, Agent Connelly asked the defendant to display his hands, and that the defendant at that time attempted to conceal a weapon. The agents saw the weapon, grabbed it, and then proceeded to arrest the defendant.

ported by articulable facts that criminal activity 'may be afoot'," *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884), such a limited stop for questioning does not offend the Constitution, even in circumstances where probable cause for arrest may be lacking. *See also U.S. v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992). Under certain circumstances, an officer may not only briefly detain an individual for questioning, but may also "frisk" him for weapons if it is reasonable for the officer to believe that he may be armed. *Terry*, 392 U.S. at 25–26, 88 S.Ct. at 1882–1883; *see also Glover*, 957 F.2d at 1009 (2nd. Cir.1992).

■ An investigative stop comports with the Fourth Amendment only if it satisfies two, distinct criteria. First, the stop itself must be based on the officers' reasonable suspicion, supported by articulable facts, that criminal activity is underway, and second, the scope of the stop and search must be reasonably related to the circumstances that initially justified the stop. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

■ The agents here failed to satisfy the first requirement, that there be a factual predicate for a reasonable suspicion prior to the search. The standard for assessing the reasonableness of an officer's suspicion is not subject to "hard and fast rules," but it is an objective standard. *Glover*, 957 F.2d at 1010; *U.S. v. Salazar*, 945 F.2d 47, 49 (2nd Cir.1991). In this context objective means that "in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those intrusions, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id.*, 392 U.S. at 22, 88 S.Ct. at 1880.

■ When assessing whether particular information possessed by the officer is sufficient, courts look to the totality of the circumstances. *See, e.g., Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990); *Sokolow*, 490 U.S. at 7–

8, 109 S.Ct. at 1585–1586. The Second Circuit Court of Appeals has stated that in cases involving anonymous tips, the "totality of the circumstances" inquiry requires a court to consider what information underlying the tip itself was possessed by the police before they made the *Terry* stop. An officer's independent verification of the tip's specific details or observation of additional circumstances consistent with the unlawful activity have each been cited by the Court of Appeals as a way of enhancing the reliability of the tip. *See U.S. v. Walker*, 7 F.3d 26, 31 (2d Cir.1993); *U.S. v. Bold*, 19 F.3d 99, 103 (2d Cir.1993); *Salazar*, 945 F.2d at 51.

In this case, the DEA agents had ample reason to be on the look-out for suspicious cars, given that the woman arrested in the drug transaction had stated that she would arrive at the hotel in a car that could not be left unattended. The agents were not, however, justified in relying only on Santiago's bare conclusion that this particular cab was suspicious. Rather, to justify an investigative stop of the cab, the officers would need to be aware of articulable facts corroborating Santiago's suspicion. If, for instance, after Santiago pointed out the car, the agents had observed particular features of the car and its movements that confirmed Santiago's impression, the agents may have may have had a reasonable basis for a *Terry* stop. Indeed, such specific information provided in tips and later corroborated by officers' own observations of particular vehicles suspected to be involved in criminal activity have supported findings of reasonable suspicion. *See, e.g., Bold*, 19 F.3d at 102–03 (anonymous tip describing location and physical description of defendants and their automobile, along with information that one of them possessed a gun, was sufficient to constitute a reasonable suspicion when combined with officers' own observations that a car meeting that precise description was parked suspiciously in a remote area of the described parking lot). However, as both Agents Reyes and Connelly testified, at the time that they approached the cab, ordered the driver out, and questioned the defendant, they knew only that Santiago believed that the cab was suspicious, and that the cab had tinted windows. The prosecutor has not argued that the mere presence of tinted windows in the cab justi-

fies a search, and I hold that it does not. The agents thus did not have the required factual basis to justify the stop of that particular cab.

As the Second Circuit Court of Appeals recently noted, "[a] *Terry*-type patdown is permissible with respect to persons who are believed, on the basis of specific and articulable facts, to have behaved suspiciously ...; but such a patdown is not permissible with respect to a person in a public place where the officers have no specific and articulable facts on which to base a suspicion of *that person in particular*." (emphasis added) *U.S. v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir.1994). The Court of Appeals in *Jaramillo* also cited approvingly the Supreme Court's determination in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), that " 'a person's mere propinquity to others independently suspected of criminal activity' provides neither probable cause to search that person, nor the basis for 'a reasonable belief that he was armed and presently dangerous.' " *Jaramillo*, 25 F.3d at 1152 (quoting *Ybarra*, 444 U.S. at 91, 100 S.Ct. at 342).

 Because the government did not demonstrate that its *Terry* stop of the defendant was based on the reasonable suspicion required by the Fourth Amendment, the evidence obtained in the search must be suppressed.[2]

### III. CONCLUSION

For the reasons set forth above, the defendant's motion to suppress the evidence is granted.

SO ORDERED.

---

**2.** I note that the defendant has the initial burden of establishing that his or her own Fourth Amendment rights were violated by the challenged search or seizure by demonstrating that he or she has a legitimate and reasonable expectation of privacy in the place searched. *U.S. v. Osorio*, 949 F.2d 38, 40 (2nd Cir.1991). Once this burden is met (and the government did not contest that the defendant here met his burden of demonstrating that he had a right to privacy inside the cab), the burden then shifts to the government to show that a warrantless search fell within one of the exceptions to the warrant requirement. *See, e.g., U.S. v. George*, 975 F.2d 72, 77 (2nd Cir.1992); *U.S. v. Ochs*, 461 F.Supp. 1 (S.D.N.Y.1978), aff'd, 636 F.2d 1205 (2d Cir. 1980). Specifically, the government must show by a preponderance of the evidence that the warrantless search does not contravene the Fourth Amendment. *U.S. v. Matlock*, 415 U.S. 164, 178, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).